UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
VIOLETA DZIKOVIC, HATIXHA ZHERKA, KUJTIM
ZHERKA, JOHN O'NEILL, GABRIEL POTENTE,
MADLIN SULEIMAN, LANA MARJI, KENNETH
HESLOP, RANDA SAYEGH, CHANDRA SOOKDEO,
JONI CAMPBELL, YOLANDA COLLAZO, ROBERTO
RODRIGUEZ, GUILLERMO CORSO, CHEZEKIA
CORSO, ARACELIS BATISTA, ALICIA CORZO,
MARIO MARTINEZ, ANGEL FELIZ, Sr., ANGEL
FELIZ, Jr., DOMINICK D'INTINO, ROBERT
PALERMO, SAL POTENTE, JAMES CAREY,
VERONIKA DZIKOVIC and DEREK ROBERTO,

                Plaintiffs,                07 Civ. 7692 (CLB)

    -against-

PHILIP AMICONE, individually, EDMUND
HARTNETT, individually, JOHN A. LISZEWSKI,
Individually LAWRENCE A. PORCARI, Jr., CITY OF
YONKERS, New York, PAUL WOOD, individually,
POLICE OFFICERS JOHN DOE'S #1 to #20,
individually, and SANITATION WORKERS #1 to
#20, individually,

                Defendants.
------------------------------------------------------------------x

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO 12(b)(6) MOTION TO DISMISS BY DEFENDANT LAWRENCE A. PORCARI

Preliminary Statement

This memorandum of law is submitted in opposition to Defendant Porcari's

motion to dismiss, which motion is predicated upon a complete disregard of the facts

1

alleged in the complaint and a series of "facts" not only at variance with those alleged in the complaint but unsupported by any evidence whatsoever.

### Controlling Principles of Law

The standards governing a Rule 12(b)(6) motion are well-settled. Sheppard v. Beerman, 18 F.3d 147, 150 (2nd Cir. 1994), *cert. denied*, 115 S.Ct. 73 (1994), *citing* Ad-Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980, 982 (2nd Cir. 1987).

The Court "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2nd Cir. 2001), *citing* Irish Lesbian & Gay Org., 143 F.3d at 644; Freedman v. Freedman, 116 F.Supp.2d 379, 380 (E.D.N.Y. 2000). The Court cannot dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." Sheppard, 18. F.3d at 150 (citations omitted).

"[T]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading alone that a recovery is very remote and unlikely but that is not the test." Schlesinger v. New York City Transit Authority, 2001 WL 62868, *1 (S.D.N.Y. 2001), *citing* Chance v. Armstrong, 143 F.3d 698, 701 (2nd Cir. 1998) "(quotation marks omitted); *see also* Cooper v. Parsky, 140 F.3d 433, 440 (2nd Cir. 1998) ('The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof.') (quotation marks omitted)."

Against these well-established standards and when assessing the factual allegations plead in the complaint in the light most favorable to the Plaintiff, the Defendant's motion must be denied.

### The Presently Indisputable Facts as Alleged in the Complaint
*The Parties*

Plaintiffs are citizens of the United States, domiciliaries of the State of New York, and residents of the City of Yonkers. By reason of Plaintiffs' on-going concerns about pervasive and systemic corruption in the various municipal corporate subdivisions within and including the County of Westchester, New York, each has become an avid reader of The Westchester Guardian (hereinafter the "Guardian"), a weekly newspaper that focuses on and reports about amongst other things such corruption in the incumbent administration of the City of Yonkers (Complaint, para. 3).

Defendant Philip Amicone (hereinafter "Amicone"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly elected, incumbent Mayor of the City of Yonkers (Complaint, para. 4).

Defendant Edmund Hartnett (hereinafter "Hartnett"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly appointed, incumbent Police Commissioner for the Defendant City (Complaint, para. 5).

Defendant John A. Liszewski (hereinafter "Liszewski"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the

3

duly appointed, incumbent Commissioner of Public Works for the Defendant City (Complaint, para. 6).

Defendant Lawrence A. Porcari, Jr. (hereinafter "Porcari"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a staff attorney in the office of Corporation Counsel for the Defendant City (Complaint, para. 7).

Defendant City of Yonkers, New York (hereinafter "City"), is a municipal corporate subdivision of the State of New York, duly existing by reason of and pursuant to the laws of said State (Complaint, para. 8).

Defendant Paul Wood (hereinafter "Wood"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was a sworn member of the City of Yonkers' Police Department (Complaint, para. 8).

Defendants Police Officers John Doe's #1 to #20 and Sanitation Workers John Roe's #1 to #20, each of whom is sued in his/her individual and personal capacities only, are respectively sworn members of the City's Police Department and members of the City's Department of Public Works. Although their identities are presently unknown, their names will be ascertained during discovery at which time Plaintiffs will seek leave of the Court to add their actual names to the complaint (Complaint, para. 9).

*The Facts*

On the front page of the Guardian published July 5, 2007, the headline was: "Amicone Sells Out Families of Yonkers...Enbraces Giulio Cavallo; Brings in Nick Spano Mob". In that connection: i) a page "2" article referenced Amicone as a "Man

4

Who Would: Take the endorsement of Nick Spano, a fallen, crooked politician, and create taxpayer-funded jobs for his mob; Bring Giulio Cavallo, a political prostitute who sells cross-endorsements for cash, into the election process; Run on a party line whose chairman, Zehy Jereis, is an election fraudster and a convicted drug dealer", and, ii) a page "4" editorial that, *inter alia*, expressed the following "Opinion": "Such has been the sordid tale of recent elections in Westchester, and particularly in the City of Yonkers. Given that history, we believe that the race for Mayor of Yonkers, pitting incumbent Republican Phil Amicone, and every undesirable political creature he can muster, against Independent Nader Sayegh, and Democrat Dennis Robertson, in a context that will require the utmost attention of the Voters' Rights Division of the Justice Department, and the provision of sufficient observers and enforcement personnel to protect the integrity of the outcome" (Complaint, para. 10).

On the front page of the Guardian published the week of July 9, 2007, the headline read: "A Tale of Two Cities", beneath which to the left was a photograph of the Mayor of Mount Vernon, New York (Ernie Davis), and beneath which to the right was a photograph of Amicone.

The Davis photograph bore the legend: "DUMB". The Amicone photograph bore the legend: "DUMBER" (hereinafter collectively referred to as "DUMB & DUMBER") -- in connection with which readers were invited to "See <u>In Our Opinion</u>, p 4" (Complaint, para. 11).

In the editorial concerning the front page story, captioned "In Our Opinion . . .Sodom and Gomorrah", the Guardian expressed *inter alia* the following thoughts regarding Davis and Amicone:

5

"We must sadly conclude that Davis and Amicone have each been abject failures, little more than caretakers, at best, not likely to improve the circumstances of the city they have been entrusted with, if placed back into their present positions. In short, we believe Ernie Davis and Phil Amicone have not only squandered vast human and financial resources, but also the wonderful opportunity to bring about significant positive change.

Consider the fact that Mount Vernon and Yonkers are each under Federal Investigation. . .in connection with projects and programs involving huge sums of money. . .There's a distinct odor of fish somehow attached to these financial mysteries.

. . .As regards crime, there is no denying that street crime and gun violence in both Yonkers and Mount Vernon have been spiraling out of control under Amicone and Davis respectively. Additionally, the Yonkers Police Department has had, and continues to have, a well-deserved reputation for police brutality, a problem neither Phil Amicone nor Commissioner Hartnett have made any convincing effort to abate.

      *     *     *

The decay and destruction of formerly strong, proud neighborhoods and public schools under Davis and Amicone has been the inevitable product of corrupt, uninspired administrations more concerned with satisfying and fattening political powerbrokers and criminal

elements such as Giulio Cavallo, Zehy Jereis, Nicky Spano, Larry Schwartz, Reggie LaFayette, and their ilk. . .In short, we believe Ernie and Phil have been marching to the beat of the wrong drummer for quite some time, and are not likely to alter their cadence anytime soon."
(Complaint, para. 12).

Commencing during the week of July 9, 2207, and continuing thereafter, employees of the Guardian's owner repeatedly sought to distribute inside and/or outside Yonkers' City Hall:

a. Copies of DUMB & DUMBER as contained in the Guardian,

b. Copies of the July 26, 2007, Guardian the front page headline of which reported: "Guardian Publisher Offers $25,000 Reward For Information Leading to the Arrest and Conviction of Westchester Public Officials and Politicians Who Have Broken the Law and Betrayed the Public Trust", and,

c. Copies of the August 2, 2007, Guardian the front page headline of which read: "Phil Amicone A Huge Flop! Fails to Deal With Police Brutality. Sharpton Correctly Identifies Problem As Not Targeting Only the Minority Community"
(Complaint, para. 13).

In that connection pursuant to a coordinated plan of action orchestrated by Amicone, Hartnett, Liszewsky, Porcari, their co-defendants and numerous members of the City's Police and Public Works Departments, all copies of the Guardian were repeatedly confiscated and discarded by Defendants - - hateful conduct motivated in whole or in substantial respect by the substantive content of the Guardian concerning Amicone and the Yonkers Police (Complaint, para. 14).

7

Also in that connection and pursuant to the same coordinated plan of action, in excess of fifty Guardian newsracks were confiscated - - many of which were discarded - - by Defendants under the direction of Liszewski, action taken by similarly motivated hateful conduct (Complaint, para. 15).

As a further consequence of that coordinated action, Defendants repeatedly and daily targeted employees of the Guardian's owner, as indicated *infra*, threatened them with arrest, and charged them criminally - - with the same motivation and the objective of entirely stopping dissemination of the Guardian in and about City Hall and throughout the City because of its substantive content.

In that connection and with a view towards intimidating certain of those employees Porcari, pretending to be a sworn member of the Police Department, exhibited to them an apparent police badge and threatened them with arrest/imprisonment in the event that they did not immediately cease distributing the Guardian (Complaint, para. 16).

By way of contrast publications favorable to Amicone and the City (such as the ironically named "Yonkers City of Vision") were permitted by the Defendants to be dispensed from *inter alia*:

> a. A newsrack, located on a stairway in City Hall,
>
> b. A counter at a security desk in City Hall as manned by a uniformed Police Officer, and,
>
> c. Newsracks placed on city-owned property throughout the City.

(Complaint, para. 17).

Also by way of contrast, persons distributing the publications favorable to Amicone and the City were permitted with impunity by Defendants to place those periodicals:

    a. In the stairway newsrack referenced *supra*,

    b. On the security desk counter as referenced *supra*, and,

    c. In newsracks situated on public property throughout the City.

(Complaint, para. 18).

As a proximate result of Plaintiffs' conduct Wood, Porcari, and Police Officers John Doe's #1 to 20 repeatedly confronted employees, and at least one officer, of the Guardian's publisher and:

    a. Ordered them to cease distributing the Guardian on the supposed premise that its distribution was illegal in Yonkers,

    b. Issued multiple criminal informations charging them with distributing the Guardian,

    b. Ordered them to leave the premises,

    c. Threatened them with arrest/incarceration should they return to distribute the Guardian,

    d. Falsely advised them that it was illegal to use a camcorder to memorialize their [Defendants'] unlawful conduct - - advice that was both challenged and ignored by Plaintiffs, and,

    e. Coerced them to depart from the City by intimidation.

(Complaint, para. 20).

Under the premises Defendants' conduct has intentionally prevented and/or substantially impaired the dissemination of the Guardian within and throughout the City as a result of which Plaintiffs have been unable to obtain/read the Guardian and learn information, ideas and opinions as provided by that publication regarding on-going corruption in the City's government (Complaint, para. 21).

As a proximate result Plaintiffs have been caused to suffer: irreparable damage to their rights as guaranteed by the First Amendment; emotional upset; impairment of their otherwise insight into the criminal wrong-doing routinely indulged in by City officials and persons with whom they associate; fear of the secrecy with respect to which Defendants have deliberately enshrouded their misfeasance, malfeasance and corrupt practices; fear of the blatant abuse of power and authority by the Defendants in their suppression and violation of First Amendment rights; dismay and shock at the calculated misuse of public funds wasted by Defendants to support their campaign of terror against the Guardian and its readers; anxiety attributable to the suppression by Defendants of the Guardian and the impairment of Plaintiff's right to knowledge and information; punishment for exercising their right of free speech; and otherwise rendered sick and sore (Complaint, para. 22).

*Plaintiffs' Claim*

On the facts set forth *supra* Plaintiffs contend that the Defendants' conduct violated their rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

The fabricated "facts" contained in the "Preliminary
Statement" in Defendant Porcari's Memorandum of Law

Contending that Porcari is entitled to dismissal on the alternative grounds of absolute or qualified immunity (Defendant's Notice of Motion, p. 2), movant variously contends:

- "The Complaint should be dismissed as and against Porcari [because] none of the allegations set forth in the Complaint, as and against Porcari, have anything to do with any of the Plaintiffs" (Memorandum, p. 2)[1],

- "Porcari has absolute immunity over [*sic*] the claims asserted against him in the Complaint because his alleged actions are well within the scope of his duties and functions as an attorney with the Office of the Corporation Counsel of the City of Yonkers" (*ibid.*)[2],

- "Porcari is entitled to qualified immunity. Porcari's alleged actions were taken against employees and one officer of the Guardian News, Inc, none of whom are plaintiffs herein. Such alleged actions, therefore would not violate the constitutional rights of Plaintiffs, alleged readers of the Newspaper [*sic*.]" (*ibid.*), and,

- "[I]t was objectively reasonable for Porcari to believe that his alleged actions were lawful at the time. Indeed, such alleged

---

[1] As discussed *infra* the complaint alleges that Porcari, acting in concert with his co-defendants, intentionally prevented distribution within Yonkers of The Guardian, denying Plaintiffs their well-established First Amendment right to both receive and to read that periodical.

[2] As discussed *infra* the complaint alleges that Porcari engaged in three Class A Misdemeanors under New York State Law: Criminal Impersonation, Coercion in the Second Degree and Official Misconduct. There is not a single allegation that his conduct was engaged in as part of his "duties and functions" as a member of the staff of Corporation Counsel.

actions consisted of informing individuals, <u>not Plaintiffs</u>, that if they violated the Yonkers City Code...they would receive summonses. Such alleged actions are not unreasonable, unlawful or actionable" (*ibid.*)[3].

### The fabricated "facts" contained in Porcari's "Absolute Immunity" Argument (Memorandum, Point I)

In advancing the argument that he is entitled to dismissal of the complaint on the basis of absolute "prosecutorial immunity" (Memorandum, at p. 2), Porcari baldly asserts in pertinent respect:

- "...the allegations concerning his [Porcari's] actions merely involve his interpretation and enforcement of the Code"[4],

- "As an attorney for [*sic.*] for the Office of the Corporation Counsel, Porcari, among other things, interprets the Code and prosecutes violations of same. In fact, Porcari's main duty is to prosecute violations of the Code"[5].

---

[3] As discussed *infra* the complaint made no such allegation. Nothing in the complaint speaks to informing anyone about violating the City Code. Rather the complaint unambiguously alleges that Porcari "tinned" (flashed a badge indicating he was a police detective) the Guardian's newspaper distributors, and threatened them with prosecution and imprisonment if they continued disseminating the newspaper. Moreover, Section 100-35, upon which appearance tickets were issued for disseminating The Guardian is First Amendment violative on its face. No municipal government can absolutely ban the dissemination of "written material" on public property.

[4] The complaint of course says not one word about Porcari's prosecution of anything and/or anyone. It similarly says zero about his supposed interpretation and/or enforcement of the Code. Rather it alleges two distinct violations of the New York State Penal Law in connection with his rogue albeit successful effort to suppress the First Amendment rights of the distributors of the Guardian and the readers of that periodical.

[5] The complaint says nothing whatsoever about Porcari's duties as a staff attorney. It says nothing whatsoever with respect to his supposed responsibility to interpret the Code. It says zero regarding Porcari's prosecution of Code violations and/or his supposed "main duty" to engage in any such prosecutions.

12

- "...the Complaint alleges that Porcari observed potential violations by individuals (<u>not</u> Plaintiffs), and informed them that their conduct constituted violations of the Code, and if it continued, they would be issued violations"[6].

### The fabricated "facts" contained in Porcari's Qualified Immunity Argument (Memorandum, Point II[7]

Advancing his claim of qualified immunity Porcari asserts that it is alleged in the complaint that "Porcari's...actions involve him interpreting the Code, reasonably surmising that individuals...were violating the Code and prudently advising them that summonses would be issued if the violations continued". While it may be that someone else's federal complaint makes the allegations about which Porcari's has fantasized, no such allegations are contained in the complaint at bar.

## POINT I

### ABSOLUTE PROSECUTORIAL IMMUNITY HAS ABSOLUTELY NOTHING TO DO WITH THIS LAW SUIT

While it is axiomatic that a "prosecutor who faces a §1983 suit in his individual capacity may claim absolute prosecutorial immunity where the conduct in question was 'intimately associated with the judicial phase of the criminal process'" (Movant's Memorandum of Law at Point I, p. 2), this case has absolutely nothing to do with

---

[6] Unfortunately for movant's credibility, the complaint does not make any such allegations at all.
[7] In advancing the qualified immunity argument it is conclusorily asserted that "Plaintiffs version of the facts does not show that Porcari's conduct violated their First Amendment rights. Plaintiffs are merely alleged readers of the Newspaper...[T]he constitutional rights Plaintiffs claim are violated were not 'clearly established'". Unfortunately as discussed *infra* the well-settled case law is to the contrary.

13

Porcari's undocumented, self-serving, and bald assertions that if the complaint were re-written to allege prosecutorial misconduct he would have a potential defense grounded in absolute immunity.

In that connection we are unaware as to how, even in the City of Yonkers, an attorney employed by local government can criminally impersonate a police officer in order to intentionally violate persons' First Amendment rights and then urge that the crimes he committed [New York State Penal Law §190.25(1)(2)(3), Criminal Impersonation, a Class A Misdemeanor, §195.00(1), Official Misconduct, a Class A Misdemeanor, and §135.60(4)(8)(9), Coercion in the Second Degree, a Class A Misdemeanor] are either functions of a prosecutor or are "intimately associated with the judicial phase of the criminal process".

In short since his conduct as alleged in the complaint was totally unrelated to that of a prosecutor, his case citations for the proposition of absolute immunity are simply irrelevant.

## POINT II

### QUALIFIED IMMUNITY HAS NOTHING WHATSOEVER TO DO WITH THIS LAW SUIT

Citing hornbook, albeit totally irrelevant, case law Porcari argues (Memorandum, Point II, p. 4) that:

> "[q]ualified immunity protects government officials from civil liability when performing discretionary duties insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . .Put another way, a government

official has qualified immunity for actions that were 'objectively reasonable'. . .The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages arising from claims brought against them in their individual capacities".

He then baldly claims (*id.* at p. 5) that:

- "Plaintiffs version of the facts does not show Porcari's conduct violated their First Amendment rights [because] Plaintiffs are merely alleged readers of the Newspaper. . .Porcari's alleged actions did not violate any right, let alone a constitutional right of any of the Plaintiffs"[8],

- "Porcari's alleged actions involve him interpreting the Code, reasonably surmising that individuals (employees and an officer of the Guardian) were violating the Code and prudently advising them that summonses would be issued if the violations continued. It would be objectively reasonable for Porcari to believe that such alleged actions were lawful at the time.[9]"

As a threshold matter, each of the Plaintiffs had at the time of the events alleged in the complaint a clearly established First Amendment right to receive and read the Guadian. Griswold v. State of Connecticut, 381 U.S. 479, 483 (1965)("The right of freedom of speech and press includes not only the right to utter or to print,

---

[8] As to this legal conclusion, advanced without citation to anything, Porcari is dead wrong as discussed *infra*
[9] As to this factual assertion: it is contrary to the allegations of the complaint; it is conclusory; it is self-serving and it is, on this record, entirely fabricated.

but the right to distribute, the right to receive, the right to read. . .and freedom of inquiry, freedom of thought, and freedom to teach"); Martin v. City of Struthers, 319 U.S. 141, 143 (1943)("The right of freedom of speech and press has broad scope. . .This freedom embraces the right to distribute literature. . .and necessarily protects the right to receive it"); Abdul Wali v. Coughlin, 754 F.2d 1015 1026 (2d Cir. 1985)("To deprive one of his constitutional rights. . .to read what he will and when he will, is in this Court's view irreparable and immediate injury. . .Precious [F]irst [A]mendment liberties would be rendered all but meaningless if those rights could be restricted even for short periods of time"); see Allen v. Coughlin, 64 F.3d 77 (2d Cir. 1995)(First Amendment rights of inmates to receive newspapers).

Under the circumstances Porcari's conduct violated clearly established constitutional rights. Any reasonable person would have appreciated that circumstance. In short, Porcari's conduct is objectively **un**reasonable.

Furthermore, since there is nothing whatsoever alleged in the complaint regarding Porcari's "interpreting the Code" and/or "reasonably surmising that individuals. . .were violating the Code" and/or "prudently advising them that summonses would be issued if the violations continued", Porcari's argument to that effect is at best objectively absurd.

<u>Conclusion</u>

The motion to dismiss as to Porcari should in all respects be denied.

Dated: White Plains, N.Y.
October 9, 2007

LOVETT & GOULD, LLP
Attorneys for Plaintiff
By: _____
Jonathan Lovett (4854)
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401